## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JONAH  LONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-01619-JMS-DKL |
| | ) | |
| MATTHEW KINKADE, D.  YOUNG, | ) | |
| S.  KINKADE, T.  CLINE, | ) | |
| J SORIA, J INGRAM, R. GRABER, | ) | |
| | ) | |
| Defendants. | ) | |

**Entry Discussing Defendants' Motion for Summary Judgment**

Plaintiff Jonah Long, an Indiana state prisoner, filed this civil action alleging that his Fourth Amendment rights were violated during a drug raid at his residence, 2943 Shelby Street, Indianapolis, Indiana, on June 25, 2012.[1] Long alleges that the defendants are liable to him for the illegal search and seizure which occurred at his residence. He sues various members of the Metropolitan Drug Task Force in their individual capacities pursuant to 42 U.S.C. § 1983. The defendants remaining in this action, Matthew Kinkade, Dale Young, Steven Kinkade, Jesus Soria, Jeremy Ingram, and Ryan Graber, (the "defendants") seek resolution of the claims alleged against them through summary judgment. They argue that exigent circumstances existed for searching Long's residence and seizing illegal drugs without a warrant and raise the affirmative defense of

---

[1] Long is currently serving time for dealing in methamphetamine, a Class A felony and resisting law enforcement. This conviction is based on evidence collected on September 7, 2012, from Long's car and hotel room. The searches and seizures at issue here are not implicated.  *See Long v. State,* 9 N.E.3d 771, 2014 WL 1246004 (Ind. Ct. App. March 26, 2014).

1

qualified immunity. Long has opposed the defendants' motion. For the reasons explained below, the defendants' motion for summary judgment [dkt.124] is **granted in part and denied in part.**

## I.
### PRELIMINARY MATTERS

As a preliminary matter, Long objects to the timeliness of the defendants' motion for summary judgment. This objection is overruled. The Entry of August 22, 2014, extended the summary judgment deadline through October 21, 2014. This new deadline applied to all parties. On October 21, 2014, during the late afternoon, the defendants filed their motion for summary judgment, and designation of evidence. The brief in support and notice to pro se plaintiff, however, was not filed until 12:16 a.m. on October 22, 2014. This delay is unfortunate, but not sufficient to warrant striking the defendants' motion and supporting documents. Further, Long was not prejudiced by this delay of 16 minutes. To the contrary, the certificate of service reflects that the plaintiff's copies of the defendants' filings were placed in the mail on October 21, 2014. No relief is warranted based on this 16 minute delay.

In addition, Long argues that the defendants failed to assert the defense of qualified immunity in their answer. See dkt. 133 at p. 12 and 15. He is mistaken. The defendants gave Long adequate notice that they would purse the defense of qualified immunity. See Fed. R. Civ. P. 12(b). "Defendant acted in good faith and has reasonable grounds for believing that any acts taken did not violate any applicable federal or state laws." Det. Matt Kinkade Answer, Dkt. 32 at p. 6. "The individual Defendants are immune from liability for Plaintiff's claims to the extent the doctrines of qualified immunity . . . apply." Def. Answer, Dkt. 36 at p. 6. In addition, the claim that the individual defendants were not responsible for the conduct alleged is not an affirmative defense which must be pled. It is an affirmative element of Long's claim, which he must prove.

2

## II.
### STANDARD OF REVIEW

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence is unnecessary because, as a matter of law, it would conclude in the moving party's favor. *See* Fed. R. Civ. Pro. 56. To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed. Fed. R. Civ. P. 56(e).

The Court need only consider the cited materials, Fed. R. Civ. Pro. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson v. Cambridge Indus.,* 325 F.3d 892, 898 (7th Cir. 2003). Furthermore, reliance on the pleadings or conclusory statements backed by inadmissible evidence is insufficient to create an issue of material fact on summary judgment. *Id.* at 901.

The key inquiry, then, is whether admissible evidence exists to support a plaintiff's claims, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections,* 175 F.3d 497, 504 (7th Cir. 1999). When evaluating this inquiry, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial ... against the moving party." *Celotex,* 477 U.S. at 330.

### III.
#### FACTUAL BACKGROUND

The following statement of facts, though not established as objectively true, was evaluated pursuant to the standards set forth above.

**A. Defendant Matthew Kinkade**

Defendant Matthew Kinkade ("Det. Matt Kinkade"), not to be confused with Defendant Det. S. Kinkade, is a detective with the City of Carmel Police Department, a position he held on July 25, 2012. On July 25, 2012, he was the Case Agent and directed the Metro Drug Task Force ("Metro Drug") to enter the residence at 2343 Shelby Street without a warrant. As of the date of this incident, he had prior training at the Indianapolis Metropolitan Police Department ("IMPD") in narcotics along with attendance at the undercover narcotics school, other in-house training relating to narcotics investigation, and narcotics training at Indiana Law Enforcement Academy.

**B. Investigation of Narcotics Activity at 2343 Shelby Street**

Det. Matt Kinkade began investigating 2343 Shelby Street and conducting surveillance there in 2011 after receiving information that this residence was being utilized for the selling/distribution of methamphetamine. Det. Matt Kinkade suspected an individual who resided there, Charles Faulkner, of the sale and distribution of methamphetamine.

4

Surveillance of the residence at 2343 Shelby Street by members of Metro Drug showed multiple motion detector lights and a six foot privacy fence. Security cameras encompassed the entire residence. Based on his experience in narcotics investigation, Det. Matt Kinkade believed that the cameras and motion detectors were used to warn occupants of potential invasion from other criminals to steal drugs and money, and to be on the lookout for police.

On or about July 16, 2012, a confidential informant told Det. Matt Kinkade that methamphetamine had just been purchased at 2343 Shelby Street. This informant provided Det. Matt Kinkade information in other drug sale cases which proved to be true and Det. Matt Kinkade believed his information to be reliable.[2]

That same day, Charles Faulkner was witnessed by Det. Matt Kinkade entering the house during surveillance. Prior investigation records indicated that in November 2010 Faulkner was an occupant of the house. Faulkner was arrested as a result of that prior investigation in 2011. During his prior arrest Faulkner possessed a quantity of methamphetamine and a firearm at 2343 Shelby Street.[3]

---

[2] Long disputes that the informant was reliable. But there is no evidence that the informant was unreliable. In support, Long cites to Kinkade's testimony at the suppression hearing in which he testified that he had worked with the confidential informant for approximately a month and that the informant provided other information which was corroborated and one hundred percent accurate in one other completed case. The informant had also provided other information in other ongoing cases which was accurate. See dkt. 133 at p. 4 referencing dkt. 100 at p. 2; and July 9, 2013 suppression hearing, dkt. 44-1 at p. 44-45.

[3] Long argues that there was no nexus between the 2011 gun and drug arrest and the events of July 2012. See dkt. 133 at p. 4 and Dkt. 44-1 at p. 13-14. But the fact that the Faulkner was arrested for possessing drugs and a gun at 2343 Shelby Street two years earlier is relevant to establishing arguable probable cause in this case. See dkt. 61 at 1.

Det. Matt Kinkade then conducted surveillance during different periods of the day and saw multiple vehicles parking behind 2343 Shelby Street and a high volume of traffic in and out of the house via the back alley, which led him to believe narcotics were being sold there.[4]

### C. July 25, 2012, Warrantless Entry

During surveillance on July 25, 2012, members of the Task Force, including Det. Matt Kinkade and Det. Cline, witnessed a white Cadillac Escalade leaving the residence, with a female driver who was suspected of involvement in a drug transaction. Members of the Task Force, including Det. Matt Kinkade, conducted a traffic stop of the vehicle, and found that its female occupant, Kami Clemens, had approximately 14 grams of crystal methamphetamine and other drug paraphernalia, including spoons, and a bowl and Saran wrap for making methamphetamine, in her possession. All of this was seized.

Clemens told members of the Task Force, including Det. Matt Kinkade, that Charles Faulkner and Jonah Long, were in the 2343 Shelby Street residence and were at that time selling and in possession of about two pounds of methamphetamine, which they had procured in the past two days. She said she was delivering methamphetamine for them, and was expected back shortly at 2343 Shelby Street, by both Faulkner and Long, who would contact her if she did not return.[5] Clemens was arrested and thus unable to return to 2343 Shelby Street.

---

[4] Long argues that this information is misstated. He states that vehicles were necessarily in the alley because there is no area for parking on Shelby Street and every house on that street requires vehicles to go into alleys behind the houses for parking. Long also states that Kinkade only specifically mentioned Long, Clemens and Faulkner entering and leaving the residence during surveillance. These are the only individuals mentioned by name, but there is no evidence which contradicts that there were other individuals entering and leaving 2343 Shelby Street and in fact there were other individuals in the house at the time the officers entered.

[5] Long argues that this statement is not supported by admissible evidence because what Clemens told the officers is hearsay. In this context, Long is mistaken. Clemens' statement is not hearsay

Det. Matt Kinkade believed that once the officers were seen and their purpose known, evidence of drug transactions within 2343 Shelby Street would be destroyed by the drug sellers inside the residence, before an effective warrant could be procured. Accordingly, the officers intended to conduct a "knock and talk" with the purpose of securing the property while a warrant was obtained.

The description of Jonah Long was known from Det. Matt Kinkade's prior investigation of 2343 Shelby Street. Following the stop and arrest of Clemens, a person whose description matched Long was seen entering the residence by members of the Task Force, including Det. Matt Kinkade. In addition to Clemens and Long, other persons were seen leaving and entering the residence quickly and furtively. They all entered and left at a secluded side entrance, after parking in an alley behind the building.

Just before approaching the residence, officers observed a Blue Neon automobile parked at the rear of 2343 Shelby Street off of the alley. Det. Matt Kinkade and others then observed a male quickly exit the back yard and get in this car. Det. Matt Kinkade approached the vehicle but the driver put the car in reverse at a high rate of speed forcing Det. Matt Kinkade to jump out of the way to avoid being struck. Det. Graber immediately drew his weapon, identified himself as a policer officer, and gave repeated, loud verbal commands to the driver to stop his vehicle. The

---

because it is not offered to prove the truth of the matter asserted. The statement is offered to explain why the officers believed illegal activity was occurring at the residence and why they reasonably believed that Long and Faulkner might become suspicious of police involvement when Clemens did not return to the residence. In addition, "a finding of 'probable cause' may rest upon evidence which is not legally competent in a criminal trial." *United States v. Ventresca*, 380 U.S. 102, 107-108 (1965) ("hearsay may be the basis for issuance of the warrant so long as there is a substantial basis for crediting the hearsay"); *Franks v. Delaware*, 438 U.S. 154, 165 (1978) ("probable cause may be founded upon hearsay and upon information received from informants. . . .").

driver ignored Det. Graber's commands and continued on his path of travel speeding down the alley. Det. Cline and Det. Jesus Soria chased the fleeing vehicle down the alley to Shelby Street where they lost sight of the vehicle and then returned to 2343 Shelby Street.[6]

After this encounter, Det. Matt Kinkade, Det. Ingram, and Det. S. Kinkade, all while wearing tactical vests with the words "POLICE" on them, approached the side door of 2343 Shelby Street. The officers feared that the commotion in the alley combined with the surveillance cameras and lights around all corners of the residence, compromised their safety and made destruction of drugs and illegal activity almost a certainty.

---

[6] Long disputes this fact. He attempts to support his position by citing to Det. Young, Det. Matt Kinkade and Det. Graber's testimony. *See* Dkt. 133 at p. 5, citing Pl. Surreply, dkt. 130 at p. 4. First, Long explains that Det. Young states in his answer to an interrogatory that "I also heard that officers needed assistance following a vehicle driven by a Hispanic male that had left the residence. After locating the Hispanic male at a gas station, we briefly detained and questioned him." Dkt. 130-1 at p. 2. Second, Det. Matt Kinkade's affidavit of probable cause states that an unknown white male exited the residence and entered a Dodge Neon. Police approached the vehicle and ordered the driver to stop. The driver refused and fled the scene almost striking Kinkade. Dkt. 62 at 4. Finally, Det. Graber's answer to an interrogatory states:

> [His] understanding of the plan was to attempt a knock and talk and, if needed, secure the residence pending arrival of the search warrant. [His] role was to assist Det. Matt Kinkade with the initial knock and talk. As part of standard operating procedure, [he] was responsible for carrying the ram to the door. While approaching the rear of the residence, the plan changed due to a vehicle leaving the residence and attempting to run over Det. Matt Kinkade and Det. Sgt. Travis Cline. I drew my weapon, identified myself as a police officer, and gave verbal commands for the driver to stop his vehicle. The driver ignored my commands and continued on his path of travel. At this point, I followed Det. Matt Kinkade to the target residence because other officers were pursuing the vehicle.

Dkt. 130-2 at p. 2. Long argues that if Det. Matt Kinkade and Det. Graber's testimony is truthful, then the driver of the vehicle would have been more than just briefly detained and questioned by Det. Young. Even if the Hispanic male questioned by Det. Young is the same person identified by Det. Matt Kinkade as a white male, the fact that charges were not brought against him does not contradict the evidence that a man in a Dodge Neon exited the residence, refused to stop and fled the scene.

When officers reached the side door, they observed that it was partially open, and yelled, "Police!" several times. In response, the door was then slammed shut from inside and officers heard several locks being closed.[7] Officers also heard someone yell "Police, run!" and could hear people running and moving throughout the house.[8] Det. Matt Kinkade, Det. Ingram, and Det. S. Kinkade all observed the door slammed in response to the call of "Police" and heard the noises of people running. Despite this, Det. Matt Kinkade continued to loudly knock and announced multiple times, "Police!" and ordered those inside to open the door, but there was no response and officers continued to hear chaotic noises inside.[9]

These additional facts led Det. Matt Kinkade to conclude that the officers' purpose was then and there seen and known, that there would be no cooperation in their entering the property, and that evidence related to drug activity and sales was actively being destroyed and would be gone within mere minutes. Det. Matt Kinkade then instructed Det. Graber to ram the door. Det. Graber then rammed the door, made entry and went immediately downstairs to the basement. Once inside the basement, Det. Graber observed several male individuals hiding behind furniture so he

---

[7] Long disputes this happened as described. He argues that the number of officers, blocking of streets and bringing the door ram shows the defendants planned to go beyond a knock and talk and that they would not have allowed someone to come up to an open door and close it on them However, he fails to cite evidence to support this assertion.

[8] Again, Long disputes this fact without any evidence. He argues that common sense would show if officers were outside the residence there is nowhere to run. However, Long's deposition testimony established that when he saw the officers approaching the house he said loudly, "Police!" so that Charles Faulkner could hear him in the basement. Long. Depo. dkt. 138-1, pp 102:23-103:19. Additionally, Long was unaware of other individuals in the basement with Charles Faulkner so it is possible that he was not aware of all the sounds coming from inside the residence. Long. Depo. p 39:1-18.

[9] Long argues that even if the officers did knock there is no requirement to open the door. In addition, Long states that the disk referenced at docket 62 reflects that the calls of "police" came after the door was rammed. No disk was identified in the record.

identified himself as a police officer, ordered the individuals to the ground, and placed one of the potential suspects into handcuffs. Det. S. Kinkade followed Det. Matt Kinkade into the residence upstairs where he observed Jonah Long and another individual. Det. S. Kinkade secured Jonah Long in handcuffs.

### D. Search of Property

After all individuals inside were secure, Det. S. Kinkade gave Det. Matt Kinkade the consent to search form to obtain consent to search the residence. After confirming with Charles Faulkner's Indiana driver's license that he resided at 2343 Shelby Street, Det. Matt Kinkade obtained the verbal and signed, written consent of Charles Faulkner to search the entire premises. Further confirmation that Faulkner resided on Shelby Street was evidence found in his bedroom including personal belongings and mail.[10]

Long resided at 2343 Shelby Street. The officers were informed of this fact by Clemens prior to their entry. Long also advised the officers that the living room of the house was his bedroom.  Long did not consent to the search of the residence and protested the search of the living room/bedroom.

### E. Seizure of Property

All property seized from Jonah Long and Charles Faulkner was seized at Det. Matt Kinkade's direction and placed into the Indianapolis Police Department Property Room under his

---

[10] Long asserts that Detective Soria and Detective Graber initiated a search prior to Faulkner giving signed consent; however, Long's allegations are based purely on speculation that is unsupported by the record. For example, Long testified that Faulkner was in the basement of the residence, that he did not see Faulkner give signed consent, had never seen the signed consent form prior to seeing it at his deposition, and did not know how long officers were inside the residence prior to obtaining signed consent from Faulkner.

10

signature. The property seized from Long, along with all cash seized at 2343 Shelby Street, was made part of a forfeiture proceeding in the Marion County courts. The judgment in the forfeiture proceeding has been set aside and Long will be receiving his property or the cash resulting from the sale of that property.

Det. Matt Kinkade later prepared a probable cause affidavit based upon the facts and circumstances witnessed prior to the entry of the residence, and the subsequent results of the investigation. As the lead detective on the case, Det. Matt Kinkade was the officer who ultimately decided to present his case to the prosecutor's office to bring the charges against Long. None of the other defendants assisted Det. Matt Kinkade with the drafting or submission of his Affidavit for Probable Cause.

Long asserts no claim for any physical injury as a result of the incident on July 25, 2012.

**F. Other Metro Drug Officers**

### 1. Det. S. Kinkade

After securing Jonah Long in handcuffs, Det. S. Kinkade gave a consent to search form to Det. Matt Kinkade for his use in obtaining consent. Det. S. Kinkade left immediately after giving the form to Det. Matt Kinkade.[11] Det. S. Kinkade did not observe any officers searching the residence or the individuals while he was present and he did not arrest anyone at the residence.

### 2. Det. Ryan Graber

After securing the individuals in the basement, Det. Graber did not question or speak with anyone until he saw Charles Faulkner sign the consent to search form presented by Det. Matt

---

[11] Long disputes this fact without any reference to admissible evidence. Long states that S. Kincaid went through some of Long's things in front of him and eventually picked them back up and put them back into the duffle bag from which they had been removed. Dkt. 133 at p. 6.

Kinkade. After receiving consent to search, at Det. Matt Kinkade's direction, Det. Graber searched the living room and took photographs of the items found in the living room. Det. Graber did not arrest anyone on scene.

### 3. Det. Jesus Soria

Upon returning from his pursuit of the fleeing Blue Neon, Det. Soria observed officers already inside the residence. After entering the residence, Det. Soria helped Det. Matt Kinkade escort two individuals from the basement to upstairs. Det. Soria did not speak with anyone until he heard that Det. Matt Kinkade obtained signed consent from Charles Faulkner. At that time and at Det. Matt Kinkade's direction, Det. Soria searched the living room and took photographs of items found in the living room. Det. Soria did not participate in the decision to enter 2343 Shelby Street, was not present when the decision was made, and arrived after entry had already been made. Det. Soria did not arrest any person at the residence and did not help to tag or secure any of the property seized.[12]

### 4. Det. Dale Young

Det. Dale Young arrived on the scene only after hearing a request on the radio for additional officers and was not part of the initial briefing of the investigation. Upon his arrival to the Shelby Street residence, Det. Young observed officers already inside and all individuals inside were secured in handcuffs. Det. Young then briefly spoke with Charles Faulkner and Det. Ingram to get the combination to a safe that officers had located inside the house. After obtaining the

---

[12] Long disputes these facts. He states Soria participated in searching the residence before Faulkner's consent was signed. There is no evidence which supports this assertion. Long cites to Soria's answers to interrogatories, but his answers do not suggest that Soria participated in a search prior consent being obtained from Faulkner. See 130-4 at p. 2.

combination from Faulkner, Det. Young walked back into the house, located money in a linen closet, and immediately notified Det. Matt Kinkade about his discovery. Det. Young did not participate in the decision to enter 2343 Shelby Street, was not present when the decision was made, and arrived after entry had already been made. Det. Young did not interview or arrest any person at the residence and did not seize or secure any of the property seized.

### 5. Det. Jeremy Ingram

Det. Ingram arrived on the scene only after hearing a request on the radio for additional officers and was not part of the initial briefing of the investigation. Upon his arrival to the Shelby Street residence, Det. Ingram observed officers already inside and all individuals inside were secured in handcuffs. Det. Ingram then briefly spoke with Charles Faulkner and Det. Young to get the combination to a safe that officers had located inside the house. After obtaining the combination to the safe from Charles Faulkner, Det. Ingram walked back into the house and asked Jonah Long for the location of the key to the safe. Jonah Long told Det. Ingram that the key to the safe was in the console or cup holder of his car, the gray Chrysler 300 parked behind the residence. Long did not give consent for the anyone to open the safe.  Det. Ingram retrieved the key and gave it and the combination to the safe to Det. Matt Kinkade. Det. Ingram did not participate in the decision to enter 2343 Shelby Street, was not present when the decision was made, and arrived after entry had already been made. Det. Ingram did not interview or arrest any person at the residence and did not seize or secure any of the property seized.

### IV.
#### DISCUSSION

Long alleges that the defendants actions in entering his home, searching his home, arresting him, and seizing his property (all without a warrant) violated his Fourth Amendment rights. The

defendants seek summary judgment based on the doctrine of qualified immunity and based on their lack of personal responsibility for the misconduct alleged.

Qualified immunity is generally a question of law for the court to resolve, *Rakovich v. Wade*, 850 F.2d 1180, 1201-02 (7th Cir. 1988), "at the earliest possible stage in litigation," *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). As such, summary judgment provides a proper posture from which to decide this objective legal question. *Rakovich*, 850 F.2d at 1204-05. Although qualified immunity is an affirmative defense, once raised, the immunity becomes the plaintiff's burden to defeat. *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008). The defendants argue that they are entitled to qualified immunity because Long cannot identify any closely analogous cases to establish a right to be free from the conduct alleged in this case or to establish that the officers' conduct was so egregious that a reasonable person would know their actions violated the constitution without guidance from the courts. *Chelios v. Heavener*, 540 F.3d 678, 691 (7th Cir. 2008).

In considering a motion for summary judgment, it is "[t]he applicable substantive law [that] will dictate which facts are material." *National Soffit & Escutcheons, Inc., v. Superior Systems, Inc.,* 98 F.3d 262, 265 (7th Cir. 1996) (citing *Anderson,* 477 U.S. at 248). In this case, the substantive law at issue is the doctrine of qualified immunity as it applies to an individual's Fourth Amendment rights. The Court begins by setting forth the basic principles of law governing Fourth Amendment claims and qualified immunity before turning to the parties' specific arguments and the analysis thereof.

14

**A. 42 U.S.C. § 1983**

A cause of action may be brought under 42 U.S.C. § 1983 against "[e]very person who, under color of statute, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  To survive summary judgment, a plaintiff claiming a violation of § 1983 must produce evidence that the defendant "caused or participated in [the] constitutional deprivation." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011).  A plaintiff may not rely on the doctrine of respondeat superior, but must instead demonstrate personal involvement in the wrongdoing; "[t]here must be a causal connection or affirmative link between the action complained about and the official sued." *Arnett v. Webster*, 658 F.3d 742, 759 (7th Cir. 2011).

**B. Qualified Immunity**

Determining whether a defendant state officer is entitled to qualified immunity involves two inquiries: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Williams v. City of Chicago,* 733 F.3d 749, 758 (7th Cir. 2013). If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment. *City & Cnty. of San Francisco, Calif. v. Sheehan*, 135 S.Ct. 1765, 1776 (2015) (emphasis in original).

Considering the facts in the light most favorable to Long, the non-moving party, the Court accepts his assertion that the defendants conducted a warrantless search, seized Long's personal property and arrested him without a warrant. In *Indiana v. Long,* Cause No. 49G20-1207-FA-

15

051024, the Honorable Steven R. Eichholtz of the Criminal Division of the Superior Court of Marion County held a suppression hearing on whether the warrantless entry of Long's home violated Long's Fourth Amendment rights. Judge Eichholtz ultimately determined that Long's Fourth Amendment rights had been violated and explained his ruling (in relevant part) this way:

> So we start this case from that standpoint that any entry into the home without a warrant is, per se, unreasonable. I think that's pretty much basic 4th Amendment Law that no one would disagree with; isn't it?  Okay.  I have listened to the evidence, and what I boil it down to is the police had a lot of uncorroborated evidence that something might have been going on there at that house, and they turned up a lot of – through their surveillance, they saw a lot of suspicious activity, none of which in and of itself corroborated any criminal activity. The confidential informant's information was – I can't find that to be reliable based on what I've heard, so what this boils down to is that they saw a white female leave the residence, subsequently arrested her and found 14 grams of drugs on her, and then went back to the house and entered it without a warrant under the theory that they had exigent circumstances to do so.

> I find under this case they didn't have exigent circumstances, and therefore the evidence – and I can't be influenced by how much you found or what you found, I have to be – make my decision on whether or not the 4th Amendment was violated here, and I feel it was by the fact that it was a home, and the evidence of any criminal activity was relatively minor and probably not enough to issue a warrant. So I'm going to suppress the evidence at this time.

Transcript of July 9, 2013, Evidentiary Hearing in Cause Number 49G20-1210-FA-073230 (Dkt. 44-1 at p. 62).

The remaining issue, is whether the constitutional rights at issue were clearly established at the time of the alleged violation.  Qualified immunity is available when a defendant's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When the constitutionality of an action depends on the existence of probable cause, the officer must have had "arguable probable cause" for qualified immunity to attach. *Bruce v. Guernsey*, 777 F.3d 872, 878 (7th Cir.

2015) (*citing Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998)). "Thus, even when an officer lacks probable cause, he is still entitled to qualified immunity when a reasonable officer "could have reasonably believed that probable cause existed in light of well-established law." *Id.* at 878-79 (*citing Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997)).

In this context, qualified immunity provides shelter for officers who have "arguable probable cause" to arrest—i.e., those officers that reasonably but mistakenly believe they have probable cause. *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013). Though they may appear to be the same, the probable-cause and arguable-probable-cause inquiries are different. *Id.* (*citing Fleming v. Livingston County, Ill.*, 674 F.3d 874, 880 (7th Cir. 2012)). A search, seizure or arrest without probable cause is a violation of a constitutional right, whereas a search, seizure or arrest without *arguable* probable cause is a violation of a "clearly established" constitutional right. *Id.* (*citing Hunter v. Bryant,* 502 U.S. 224, 227 (1991); *McComas v. Brickley,* 673 F.3d 722, 725 (7th Cir. 2012)). Arguable probable cause exists when a reasonable officer "in the same circumstances and ... possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014)(quoting *Humphrey,* 148 F.3d at 725).

The plaintiff alleges four instances in which he contends that his Fourth Amendments rights were violated: 1) the warrantless entry into his home; 2) the search of his home without a warrant; 3) the seizure of his property and 4) his arrest. In evaluating the constitutionality of this conduct, the Court must "carve up the incident into segments and judge each on its own terms to see if the officer[s] w[ere] reasonable at each stage." *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999) (citation and quotation marks omitted).

17

### C. Warrantless Entry

Warrantless entries of homes, while presumptively unreasonable, are constitutionally permissible when there is probable cause and exigent circumstances, creating a compelling need for official action when there is insufficient time to procure a warrant. *United States v. Rivera,* 248 F.3d 677, 680 (7th Cir. 2001), *quoting Payton v. New York*, 445 U.S. 573, 585-6 (1980). Probable cause exists when "the facts and circumstances within [the officer's] knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed an offense." *Williams v. Rodriguez,* 509 F.3d 392, 398 (7th Cir. 2007) (citation and internal quotation marks omitted).

In addition to establishing probable cause, the government has the burden of establishing exigent circumstances upon an objectively reasonable basis, including an objectively reasonable fear that evidence is about to destroyed or removed. *Rivera*, supra. The inquiry is not to determine what officers could have done, but rather whether they had, at the time of the decision, a reasonable belief that there was a compelling need to act and no time to obtain a warrant. *See Saucier v. Katz,* 533 U.S. 194 (2001) (explaining that most issues under the Fourth Amendment "are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred"). The Seventh Circuit Court of Appeals has "repeatedly held that the potential that evidence, especially drugs, will be destroyed gives rise to exigent circumstances." *United States v. Saadeh*, 61 F.3d 510, 516 (7th Cir. 1995); *see also Minnesota v. Olson,* 495 U.S. 91, 100 (1990) (exigent circumstances may include hot pursuit of a fleeing felon, imminent destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling); *United States v. Young,* 909 F.2d 442, 446 (11th Cir. 1990) ("As many courts

have noted, the need for the exigent circumstance doctrine is particularly compelling in narcotics cases, because contraband and records can be easily and quickly destroyed while a search is progressing."), *cert. denied,* 502 U.S. 825 (1991). "Exigency cases thus typically speak either of there being probable cause to believe a crime is being or has been committed or of the need to act in order to fulfill the probable cause requirement, as by preventing a suspect from fleeing or preserving evidence that might otherwise be destroyed." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 560 (7th Cir. 2014) "[T]his *ex ante* approach is beneficial to police officers because it allows them to act quickly based on the information at their fingertips, without worrying that evidence discovered at a later time will ultimately demonstrate that they acted unreasonably." *Bruce v. Guernsey*, 777 F.3d 872, 878 (7th Cir. 2015)

The record reflects that the officers had arguable probable cause to believe that a crime had been committed, specifically that Faulkner was in possession of and distributing methamphetamine out of 2343 Shelby Street. The defendants argue that exigent circumstances existed for the officers to enter the home without a warrant to ensure that drugs and paraphernalia were not being destroyed. The following circumstances confronted the Officers at the time of the decision for warrantless entry:

Defendants approached 2343 South Shelby Street, Indianapolis, Indiana, after being told during a traffic stop that the driver (who had just left the residence) knew that methamphetamine was being sold from the residence by Long and Charles Faulkner. She knew this because she was on her way to deliver drugs and would be contacted by Long and/or Faulkner when she did not return. This information was consistent with two prior reports that drugs were being sold at the residence, as well as, the activity observed at the residence. Once officers started approaching the

residence to conduct a "knock and talk" for the purpose of seeking cooperation in securing the residence while a search warrant was procured, they were forced to make split-second decisions based on 1) the actions of the male who left the residence then nearly ran officers over with his blue Neon in the alley, 2) the people inside the residence yelling "Police, run," and 3) the numerous surveillance cameras surrounding the residence.

The officers in this case had arguable probable cause to believe that a home contained contraband, which was evidence of a crime. They reasonably believed that the home's resident, if left free of any restraint, would destroy that evidence. Accordingly, they forcibly entered the home without a warrant to secure the home until a search warrant could be obtained. A reasonable officer, could reasonably believe that these actions met the Fourth Amendment's demands. *Illinois v. McArthur*, 531 U.S. 326, 337 (2001) (finding that securing home while a search warrant was obtained was reasonable).

Long seeks to defeat this claim of immunity. To defeat a claim of immunity, plaintiff must prove that a constitutional right is clearly established either by showing that (1) "a clearly analogous case establishing a right to be free from the specific conduct at issue" or that (2) the "conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *See Chelios*, 520 F.3d at 691 (*citing Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)). First, Long argues that the Fourth Amendment is clearly established. See dkt. 133 at p. 15. But, the Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality. Qualified immunity is no immunity at all if "clearly established" law can simply be defined as the right to be free from unreasonable searches and seizures. *City & Cnty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1776 (2015).

In addition, Long's suggestion that the ruling suppressing the evidence collected from his residence during his state court criminal case is a closely analogous case for the purpose of defeating the qualified immunity defense is insufficient because that ruling came from a state trial court after (not before) the conduct at issue occurred. Dkt. 133 at p. 15. As the state court noted "the evidence of criminal activity was relatively minor and **probably not enough** to issue a warrant." Dkt. 133 at p. 15 (emphasis added), citing Transcript at dkt. 44 at p. 69. This statement itself suggests that the evidence was **arguably** enough to establish probable cause.

Accordingly, all defendants are entitled to judgment as a matter of law on the claim of unlawful entry.

### D. The Search

#### 1.    Qualified Immunity

Having determined that the officers had arguable probable cause to enter 2343 Shelby Street without a warrant, we now turn to Long's claim that his Fourth Amendment right to be free from illegal search was violated.

While a warrantless entry for the purpose of conducting a search ordinarily violates the Fourth Amendment, *see Payton,* 445 U.S. at 585, a well settled exception to this general rule permits authorities to conduct a search without a warrant if they obtain voluntary consent either from the individual whose property is to be searched, *Schneckloth v. Bustamonte*, 412 U.S. 218, (1973), from a third party possessing common authority or joint control over the premises, *Florida v. Jimeno*, 500 U.S. 248, 249–50 (1991); *United States v. Matlock*, 415 U.S. 164 (1974), or from an individual with the apparent authority to consent to the search. *Illinois v. Rodriguez*, 497 U.S.

177, 187 (1990); *United States v. Saadeh*, 61 F.3d 510, 517 (7th Cir. 1995). In this case, the officers obtained consent to search from Charles Faulkner who lived at 2343 Shelby Street.

The Supreme Court has held, however, that "a physically present inhabitant's express refusal of consent to a police search [of his home] is dispositive as to him, regardless of the consent of a fellow occupant." *Fernandez v. California*, 134 S. Ct. 1126, 1133-34 (2014) (internal citation omitted). This was the law in 2012 when the search of 2343 South Shelby Street occurred. *See Georgia v. Randolph*, 547 U.S. 103 (2006) (The Supreme Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id.* at 120).

The briefing on the motion for summary judgment does not adequately develop this issue. The defendants proceed on the basis that the consent from Faulkner was enough. It was not because Long presents evidence that he told the officers that lived at 2343 Shelby Street and he did not consent to the search. The law on this issue is clearly established, if Long objected to the search as he states he did, the officers needed a warrant to proceed with the search. Whether the officers' reasonably believed that Long's consent was unnecessary, however, is a material fact in dispute. *Anderson v. Creighton*, 483 U.S. 635 (1987) (stating a "law enforcement officer who participates in a search that violates the Fourth Amendment may [not] be held personally liable for money damages if a reasonable officer could have believed that the search comported with the Fourth Amendment."). For example, although not specifically referenced by either party, the Court notes that Det. Matt Kinkade stated the "following in his affidavit for probable cause:

22

All occupants were read Miranda Rights.  A consent to search form was signed by Mr. Faulkner.  <u>Your affiant asked Mr. Long for permission to search and asked if he would like to read and sign a consent to search form since he stated he lived "in and out" of the residence also.</u>  Mr. Long stated he had no right to say yes or no to a search of the residence since he had <u>no door on his room</u> and stated he doesn't live there on a full time basis.  When asked if he had no expectation to privacy in the residence Mr. Long stated "No".  Mr. Long stated that it was Mr. Faulkners house and if Mr. Faulkner stated we could search then that was up to him.

Dkt. 62 at p. 4. Long's deposition makes clear that he denies that anything he said could be understood to suggest that he consented to the search or did not make his objection to the search known. See dkt. 138-1 at p. 3-4.

The facts taken in the light most favorable to Long reflect that he lived at 2343 Shelby Street and that he refused to consent to the search. In addition, the defendants do not argue and there is no plausible basis to conclude that any exigent circumstances existed after the officers entered the residence and secured its occupants that could justify the warrantless search over Long's objection. Thus, summary judgment on the theory of qualified immunity is **denied.**

### 2. Personal Responsibility

Next, defendant Officers Young, S. Kinkade, Soria, Ingram and Graber argue that they are entitled to summary judgment because they were not personally involved in the alleged constitutional deprivation. *See West v. Waymire*, 114 F.3d 646, 649 (7th Cir.1997) ("the doctrine of respondeat superior is not available to a plaintiff in a section 1983 suit"). Many of the officers suggest that they are not personally liable for participating in the search because they were following Det. Matt Kinkade's instructions. But, the fact that Det. Matt Kinkade may have directed others to search the residence does not necessarily insulate the other officers from liability if they personally participated in the search. Accepting the facts in the light most favorable to Long, the defendants had been told by Long, Clemens or other investigating officers that Long was a resident of 2343 Shelby Street and/or that Long refused to consent to the search of his home. *Seiser v. City*

*of Chicago*, 762 F.3d 647, 654 (7th Cir. 2014) (if "the officers involved in an investigation were in communication with one another, [the Court] may, in assessing probable cause, attribute to one officer the facts known to his fellow officers.").

The undisputed record reflects that Det. Young, Det. Soria, Det. Ingram, and Det. Graber assisted with the search. Det. Young located money in a linen closet, Det. Soria opened a safe, Det. Ingram looked for a combination and key to a safe located inside the residence, Det. Graber searched the living room and took photographs of the items found. Given these facts Det. Young, Det. Soria, Det. Ingram, and Det. Graber are not entitled to summary judgment on the basis that they are not personally responsible for the illegal search of Long's residence. Nothing in this Entry, however, prohibits any defendant from testifying truthfully at trial that he had a good faith belief that Det. Matt Kinkade had obtained consent to search from all residents of 2343 Shelby Street or that he acted in reasonable reliance on this understanding when participating in the search of the residence. *See United States v. Hensley*, 469 U.S. 221, 232 (1985) (noting that a law enforcement officer has a defense to civil liability when he relies in good-faith on information provided by other law enforcement officials).

The record reflects that Det. S. Kinkade entered the residence and secured Jonah Long in handcuffs. He then gave the consent to search form to Det. Matt Kinkade. He left immediately after giving the form to Det. Matt Kinkade. He did not observe any officers search the residence or individuals while he was present. Long's assertion that Det. S. Kinkade participated in the search of his duffle bag is not supported by admissible evidence. Accordingly, Det. S. Kinkade was not personally liable for the illegal search and he is entitled to summary judgment on this claim.

In conclusion, there is a material fact in dispute regarding whether the defendants are entitled to qualified immunity on the claim of illegal search. The evidence taken in the light most favorable to Long suggests that Det. Matt Kinkade, Det. Young, Det. Soria, Det. Ingram, and Det. Graber participated in the search over Long's objection. This claim shall proceed against these five defendants. The undisputed evidence establishes that Det. S. Kinkade did not participate in the search and he is entitled to judgment in his favor on this claim.

**E. False Arrest**

Long's third claim alleges that he was arrested/seized without probable cause. Probable cause exists if the information available would justify a reasonable belief that a crime has been committed. *Mahnke v. Garrigan*, 428 F. App'x 630, 634 (7th Cir. 2011)

**1. Qualified Immunity**

The false arrest claim is not adequately briefed by either party. It is clear, however, that any probable cause to arrest is based on the items recovered during the search of the residence, including multiple digital scales, a large quantity of small clear plastic zip lock bags, large quantities of capsules containing an unknown white powdery substance believed to be MSN (a substance used to cut methamphetamine); and 147 grams of suspected crystal methamphetamine. If the warrantless search violated Long's Fourth Amendment rights then he should not have been arrested based on the items discovered during that search. Without the items seized, there was not arguable probable cause to arrest Long. Accordingly, to the extent the defendants seek summary judgment on the basis of qualified immunity for the claim for unlawful arrest, that request is denied.

### 2. Personal Responsibility

Det. Matt Kinkade was the lead detective in the Shelby Street investigation and the officer responsible for Long's arrest. The claim of unlawful arrest shall proceed against Det. Matt Kinkade only. The other defendants are entitled to judgment as a matter of law because the record reflects that they did not participate in Long's arrest.

### F. Withdrawal of Any Loss of Personal Property Claim

The complaint alleges that Long's laptop computer, two ipads, a large security system, a coin collection and more than $1,800 in cash were taken by the officers without a warrant. The defendants argue that any claim based on these facts should be dismissed because Long withdrew any claim based on the seizure of his personal property in his deposition. Instead he pursued this claim through a forfeiture proceeding in the Marion County courts. (Dkt. No. 98-2,¶ 16; Dkt. No. 98-8).

In response, Long argues that at the time of his deposition he did not know he could maintain a claim for the value of the property lost due to the small amount of money received from the sale of his property at auction. Long explains that he provided signed errata sheets which changed his answer to the questions regarding the property claims.[13]

During the course of his deposition, Long identified a list of all of the property and money he claimed was taken as a result of the July 25, 2012, search. See dkt. 125-1 at p. 7 of 21; Trans.

---

[13] Long argues that the defendants' failure to disclose this change made in the errata sheet should result in sanctions against defendants' counsel. Dkt. 133 at p. 9. In reply defendants' counsel states that they did not receive Long's errata sheet from the court reporter until November 17, 2014— two weeks after filing their Joint Motion for Summary Judgment. Raising this issue during the course of summary judgment was appropriate and Long has been given the opportunity to respond. Long has not been prejudiced by counsel's conduct and his request for sanctions pursuant to Rule 11(c) is denied.

p. 49. Long explained that he "already went back to court on this in a forfeiture hearing" and that everything was ordered returned to him. *Id.;* Trans. p. 50. He noted that most of the items had already been sold at auction so the State was ordered to give him the money from the sale proceeds. Long then proceeded to explain that he never intended for his lawsuit to include a claim based on the seizure of his property and that the seized property has nothing to do with this case.

Page 51

```
 1    Q    So then let's go through this list.  And as part of
 2         this lawsuit I know that you were asking for these
 3         things back; so if the forfeiture has already taken
 4         care of that, let's go through and kind of checkmark --
 5    A    My lawsuit is not for these items.
 6    Q    Okay.
 7    A    You know, when I gave my complaint, I was just
 8         giving the facts of what happened.  My lawsuit is not
 9         for this.  I was just stating the facts when I talked
10         about this.  My lawsuit is strictly based around the
11         constitutional violation.  I don't -- this is returned.
12         There's nothing to do with this case.  It wasn't even
13         for these.
14    Q    So you're not asking for any compensation for the
15         things listed in interrogatory number 9?
16    A    Not for these items, no.
```

Given Long's specific and clear testimony that he never intended to pursue a claim in this action based on the seizure of his property and his specific statement that he is not seeking compensation as a result of the seizure of his property, the defendants did not elicit any further testimony on this issue. Although the errata sheets have not been submitted into evidence in this case, there does not appear to be any dispute that in regards to the property claim the plaintiff stated on the errata sheet that he "didn't know until now I could request this on a Section 1983."

The Seventh Circuit has explained that "a change in substance which actually contradicts the transcript is impermissible [under Fed.R.Civ.P. 30(e)] unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'" *Beal v. Wyndham Vacation Resorts, Inc*., 956 F. Supp. 2d 962, 965 (W.D. Wis. 2013) (*quoting Thorn v. Sundstrand Aerospace Corp.,* 207 F.3d 383, 389 (7th Cir. 2000)). In this case, Long's statement that he did not know he could pursue this claim provides additional detail to his testimony that he never intended to pursue a claim based on the seizure of his personal property and that he is not seeking compensation related to this claim. This clarification, however, is not a sufficient basis to overcome his specific withdrawal of the claim. Nor will Long be permitted to make this substantive change to his deposition testimony. To conclude otherwise would unreasonably prejudice the defendants, who attempted to pursue this line of questioning during Long's deposition but were confronted with Long's clear statement that he was not and has never pursued such a claim.

Accordingly, this Court agrees that Long withdrew any claim based on the seizure of his personal property. Accordingly, this claim is **dismissed.**

## V.
### CONCLUSION

The defendants' motion for summary judgment [dkts. 124] is **granted in part and denied in part.**

The motion is granted in favor of all defendants on two of the four Fourth Amendment claims identified above: 1) the claim of warrantless entry into Long's residence and 2) the claim based on the warrantless seizure of Long's personal property.

The motion is also granted to the extent that Det. S. Kinkade is entitled to judgment as a matter of law on all remaining claims alleged against him because he is not personally responsible

28

for the conduct alleged. This Entry resolves all claims against Det. Steven Kinkade. The **clerk is**

**directed** to terminate Det. Steven Kinkade as a defendant on the docket.

The motion is granted in favor of defendants Det. Young, Det. Soria, Det. Ingram, and Det.

Graber as to the claim of unlawful arrest because these defendants lack personal responsibility for

this alleged misconduct.

The motion is denied to the extent that the claim of illegal search of the residence shall

proceed against Det. Matt Kinkade, Det. Young, Det. Soria, Det. Ingram, and Det. Graber; and

the claim of false arrest shall proceed against Det. Matt Kinkade.

No partial final judgment shall issue at this time as to the claims resolved in this Entry.

**IT IS SO ORDERED.**

Date: 08/25/2015
_____

_Jane E. Magnus-Stinson_

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

JONAH LONG
103975
Wabash Valley Correctional Facility
Electronic Service Participant -- Court Only

All Electronically Registered Counsel